**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION**

MICHELLE GREEN, Surviving    *
Spouse of Raymond George    *
Green, et al.,    *
     *
    Plaintiffs,    *
     *      CV 119-122
      v.    *
     *
UNITED STATES OF AMERICA,    *
     *
    Defendant.    *

---

**O R D E R**

---

Before the Court are Defendant United States of America's motion for summary judgment (Doc. 41) and motion to exclude (Doc. 43). For the following reasons, Defendant's motion for summary judgment is **GRANTED IN PART and DENIED IN PART**, and Defendant's motion to exclude is **GRANTED**.

## I. BACKGROUND

This is a medical malpractice action arising from the death of the late Raymond George Green ("Decedent"). Decedent "was a Gulf War veteran with a significant history of PTSD [Post-Traumatic Stress Disorder] and depression" who died by suicide on January 10, 2017. (Doc. 28, ¶¶ 9, 25.) After he retired from the armed forces, Decedent was treated by physicians and other professionals at the Charlie Norwood Veterans Administration Medical Center

("VAMC"), operated by the Department of Veterans Affairs ("DVA"), and the Eisenhower Army Medical Center ("EAMC"), operated by the Department of Defense ("DOD"). (Id. at 4.) Now, his widow and children bring this action against the United States for the alleged negligence of those agencies and their employees.[1]

Decedent retired from the armed forces in 2006 and was promptly diagnosed with depression. (Id. ¶ 11.) At the VAMC, Decedent was treated by the Operation Enduring Freedom/Operation Iraqi Freedom Clinic ("Clinic") which "[e]mbedded psychiatrists and other mental health professionals within the primary care mental health integration . . . setting as part of [Decedent's] primary care team." (Doc. 45-1, at 4-5.) Decedent was assigned several physicians as part of his care team, including Dr. Danielle C. Suykerbuyk, D.O. ("Dr. Suykerbuyk"), Decedent's primary psychiatric care provider at the VAMC; Dr. Dale Gordineer ("Dr. Gordineer"), Decedent's primary care physician at the VAMC; and licensed clinical social workers Glen A. Windley, LCSW ("Mr. Windley") and Patsy Z. Battle, LMSW ("Ms. Battle"), both at the VAMC. (Id. ¶¶ 12, 14, 24; Doc. 41-2, at 4.) Defendant also, and

---

[1] The Court notes that each Plaintiff is a member of Decedent's immediate family and, except two Plaintiffs, shares the same last name. (Doc. 1, at 1-2.) To avoid confusion, the Court will refer to each Plaintiff by their position on the docket. Accordingly, Mrs. Michelle Green, the surviving spouse of Decedent, shall be referred to as Plaintiff One. Ms. Na'Kesha Green, the administrator of Decedent's estate, shall be referred to as Plaintiff Two. Plaintiff Raven Simon Green-Harris shall be referred to as Plaintiff Three. Plaintiff Raymond George Green, Jr. shall be referred to as Plaintiff Four. Plaintiff Dontair Wilson shall be referred to as Plaintiff Five.

unrelatedly, received treatment from his primary care physician at the EAMC, Dr. Stephen J. Conner ("Dr. Conner"). (Doc. 28, ¶ 15.)

The events giving rise to this suit began in 2011. In February of that year, Decedent saw Dr. Suykerbuyk for the first time, when Dr. Suykerbuyk diagnosed him with PTSD and prescribed him "Fluoxetine (Prozac) for depression, nicotine gum for smoking cessation, Vardenafil (Levitra) for erectile disfunction [sic], and Zolpidem (Ambien) for sleep." (Doc. 41-9, at 5.)[2] At Decedent's follow-up appointment in April 2011, Decedent "indicated that the Prozac made him nauseous and apathetic, the Levitra didn't work, and the nicotine gum made him sick, while the Ambien worked well." (Id.) Decedent then "declined a trial of another anti-depressant," remaining only on Ambien. (Id.) As a result, Dr. Suykerbuyk – according to Defendant – "released [Decedent] back to Dr. Stojanov, [then] his primary care physician ("PCP"), for management of his Ambien." (Id. at 5-6.)[3]

---

[2] Both Plaintiffs and Defendant submitted statements of undisputed material facts. (See Doc. 41-9, Doc. 45-1.) "All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by a statement served by the opposing party." L.R. 56.1, SDGa.

[3] It is important to note here an important dispute. Defendant repeatedly refers to "episodes of care," in which it claims Dr. Suykerbuyk treated Decedent only during isolated, discrete periods. (See, e.g., Doc. 41-9, at 6 ("The first episode of care, whereby Dr. Suykerbuyk provided medication management for [Decedent's] PTSD, lasted approximately two months.").) Dr. Suykerbuyk testified that "if a primary care provider is seeing a patient that they identify has a mental health need and they feel that needs to see a psychiatrist, they will consult me for an episode of care." (Doc. 41-4, at 5.) Defendant argues that between these discrete 'episodes of care,' Dr. Suykerbuyk and Decedent lacked a doctor-patient relationship. (Doc. 41, at 21.) Plaintiffs disagree, pointing to Dr. Suykerbuyk's testimony that she was "considered part of [Decedent's] primary care team" to support the proposition that Dr. Suykerbuyk

3

Decedent returned to the Clinic several times, with his care and medication evolving throughout his treatment. (See Doc. 41-2.) After another referral from Dr. Stojanov, Decedent saw Dr. Suykerbuyk again in 2013 to treat his insomnia and sleep issues. (Doc. 41-9, at 6.) Decedent underwent a sleep study and switched from Ambien to Trazodone, "an older antidepressant that is now mainly used as a sleeping medication"; the Parties disagree about whether Decedent was willing (at this time) "to take further medication to treat his PTSD and depression." (Id. at 6-7; Doc. 45-1, at 8.) Then, after Dr. Suykerbuyk again referred Decedent back to Dr. Stojanov, Dr. Suykerbuyk "received the results of [Decedent's] sleep study" and informed Decedent, via telephone, that he was positive for sleep apnea, for which Decedent promptly received medical equipment and treatment "from a VA respiratory therapist." (Doc. 41-9, at 7.) Decedent returned to Dr. Suykerbuyk in November 2014 for "problems with nightmares," for which he was prescribed Sertraline (Zoloft) and an increased dose of Trazodone; in January 2015 for irritability, when he discontinued Zoloft and switched to Paroxetine (Paxil) and another increase in Trazodone; in March 2015 for grogginess, when Dr. Suykerbuyk decreased his dosage of Trazodone and increased his dosage of Paxil; in May 2015 for continued sleep problems, for

---

and Decedent had an ongoing doctor-patient relationship. (Doc. 41-4, at 5; Doc. 45, at 7.) The Court will address this disagreement below.

4

which he was switched from Trazodone to Hydroxyzine; in August 2015, when Decedent reported the medications were working and was scheduled for a six-month follow-up appointment; in March 2016, when Dr. Suykerbuyk discontinued Hydroxyzine, started him on Doxepin, and performed a suicide risk assessment that came back negative; and, finally, in April 2016, when Defendant alleges (but Plaintiffs dispute) that Decedent was "doing well," and he was "refer[ed] back" to his new primary care physician, Dr. Gordineer. (Id. at 8-11.)   The Parties agree this was Decedent's final interaction with Dr. Suykerbuyk.  (Id. at 11.)

Decedent then exclusively saw his primary care physicians for his treatment.  First, he saw Dr. Gordineer in July 2016, who did not change his medications, although Defendant notes Decedent "continued to be actively on [D]oxepin for insomnia, [P]aroxetine for nerves . . . Gabapentin, and [Viagra]."  (Id. at 11.)  This was the last direct contact Dr. Gordineer had with Decedent except for a phone call in September 2016 "concerning [Decedent's] knee brace and cane."  (Id.)  Decedent also saw his DOD physician, Dr. Conner, for his annual check-up in August 2016, where a depression screening was negative (although Plaintiffs assert Dr. Conner was unaware of Decedent's history of depression and PTSD) and Decedent was "referred . . . to ophthalmology for Iridocyclitis (inflammation of the iris)."  (Id. at 12.)  After his appointment with the ophthalmology department in September 2016, Decedent was

"released [from the DOD hospital] with instructions to follow up in [one] year." (Id.)

Thus concludes, with two notable exceptions, Decedent's contact with his medical practitioners for purposes of this case. However, it does not end the involvement of the Clinic team or Dr. Conner in Decedent's care. "[S]ometime beginning in August or . . . July" 2016, Plaintiff One went to the VAMC "and attempted to speak with both Dr. Suykerbuyk and Dr. Gordineer regarding [Decedent's] mental and physical changes." (Doc. 41-3, at 14; Doc. 45-1, at 13.) Plaintiff One "waited several hours," but "never got a chance to see" either physician. (Doc. 41-3, at 14.) On October 25, 2016, Plaintiff One called the EAMC to report concerns about Decedent – specifically, that he had "refused to leave the house for the past month, believed that someone was watching him, panicked at the sound of helicopters and airplanes overhead, was not eating[,] and refused to talk on the phone to friends or family." (Doc. 28, ¶ 15.) Dr. Conner reportedly advised Plaintiff One that Decedent "needed to be seen in the Emergency Department to be evaluated." (Id.) Dr. Green called Plaintiff One twice that day but could not reach her; he left a note for a nurse at the EAMC to inform Plaintiff One that he recommended evaluation in the Emergency Department. (Doc. 41-9, 13-14.) Plaintiff One "called back and spoke with the nurse, who relayed Dr. Conner's message and indicated that if Plaintiff One

could not get [Decedent] to the Emergency Department, she should call 911 if necessary." (Id. at 15.) Two days later, Decedent's family did so, and Emergency Medical Technicians ("EMT") came to Decedent's home "to transport him to the [Emergency Department], per Dr. Conner's recommendation." (Id. ¶ 14.) Once the EMTs arrived, they performed a 'mental status exam' and found that Decedent was alert and could not be sedated; Dr. Conner spoke with Decedent via telephone, "decided that [Decedent] was competent," and declined to instruct the EMTs to involuntarily transport Decedent to the Emergency Department. (Id.) Dr. Conner urged Decedent to visit the EAMC; Decedent "stated that he would come in that day but never showed up." (Id.)

Finally, on November 14, 2016, Plaintiffs One and Two visited the Clinic without Decedent to discuss Decedent's mental health. (Doc. 41-9, at 14.) In a meeting with Ms. Battle, Plaintiffs One and Two reported that Decedent was suffering from auditory and visual hallucinations, delusional behavior, extreme paranoia, hypervigilance, and other irrational fears. (Id. at 14-15). They disclosed that Decedent had refused treatment from the EMTs and that they had removed a gun from Decedent's possession, but denied Decedent was experiencing any suicidal ideation. (Id. at 15.) Ms. Battle urged the Plaintiffs to bring Decedent to the clinic, if possible, and informed them "that they could go to probate court and explain [Decedent's] behavior and petition the judge for

involuntary commitment." (Id.)  Ms. Battle then spoke to Decedent by phone, urging him to come to the Clinic and explaining that his refusal to do so was emotionally affecting his family; Decedent stated "he was fine and did not need to see a doctor," and that "he would see a doctor when the time came." (Id.)

Plaintiffs never contacted the probate court. (Id. at 16.) However, Decedent did make several appointments at the Clinic – first on November 18, 2016, then on December 22, 2016. (Id. at 16.)  Decedent requested to reschedule the first appointment and never came to his second appointment; it was subsequently rescheduled for January 24, 2017. (Id.)  On January 10, 2017, Decedent "died from a self-inflicted gunshot wound to the head; on his death certificate, his PTSD was listed as a significant condition that contributed to his death." (Doc. 28, ¶ 25.)

On March 21, 2018, Plaintiffs One and Two filed a form SF-95 with the Director of the VAMC in Augusta, Georgia and the DVA Office of General Counsel in Nashville, Tennessee, along with a demand letter from their attorney. (Doc. 47-1.)  In their claim, Plaintiffs One and Two alleged wrongful death and personal injury for damages totaling $4,000,000. (Id. at 4.)  The DVA denied their claim. (Doc. 28, ¶ 7.)  As a result, Plaintiffs filed this action on August 8, 2019. (Doc. 1.)  Now, as explained below, Defendant moves for summary judgment on all of Plaintiffs' claims and moves to exclude the testimony of Plaintiffs' second proferred expert,

Dr. Patrick Lillard.  The Court will address the motion to exclude and then advance to the motion for summary judgment.

## II. MOTION TO EXCLUDE

Defendant argues that Plaintiffs' second expert, Dr. Patrick L. Lillard, M.D., is not qualified to offer an expert opinion on primary care or social work under O.C.G.A. § 24-7-702(c)(2), "cannot define the appropriate standard of care applicable to this case," and should be excluded from testifying as an expert under Federal Rule of Evidence 702.  (Doc. 43.)  Finding that Dr. Lillard misstated the standard of care applicable to medical malpractice cases, the Court **GRANTS** Defendant's motion to exclude Dr. Lillard's testimony without reaching the question of whether he was qualified to offer expert opinions on primary care or social work.

"The admission of expert evidence is governed by Federal Rule of Evidence 702." Rink v. Cheminova, Inc., 400 F.3d 1286, 1291 (11th Cir. 2005).  Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.   Rule 702 charges district courts to "act as 'gatekeepers' which admit expert testimony only if it is both reliable and relevant." Rink, 400 F.3d at 1291 (quoting Daubert v. Merrell Dow Pharms, Inc., 509 U.S. 579, 589 (1993)).   Pursuant to this gatekeeping function,

district courts must engage in a rigorous inquiry to determine whether:

"(1) the expert is qualified to testify competently regarding the matters he intends to address;

(2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and

(3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."

Id. at 1291-92 (quoting City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998)).   "The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence." Id. at 1292 (citing Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999)).

After a thorough review of Dr. Lillard's deposition testimony, the Court agrees with Defendant that Dr. Lillard's testimony regarding the standard of care is not sufficiently reliable, nor sufficiently based on reliable principles, methods, or literature, to be admissible in this case. The Court further finds that Dr. Lillard's deposition testimony carries a significant risk of confusing the trier of fact in determining whether Defendant's employees satisfied their burdens under the standard of care. Accordingly, Dr. Lillard's expert testimony must be excluded.

Expert testimony must assist the trier of fact to decide a fact in issue. Thus, the testimony must concern matters beyond the understanding of the average layperson and logically advance a material aspect of the proponent's case. Daubert, 509 U.S. at 591; United States v. Frazier, 387 F.3d 1244, at 1262 (11th Cir. 2004). This is a medical malpractice case; one essential element of medical malpractice is a determination that Defendant "breached [its duty of care] by failing to exercise the requisite degree of skill and care." Knight v. W. Paces Ferry Hosp., Inc., 585 S.E.2d 104, 105 (Ga. Ct. App. 2003). "The standard to be used to establish professional medical negligence under O.C.G.A. § 51-1-27 is that standard of care 'which, under similar conditions and like circumstances, is ordinarily employed by the medical profession

generally." McDaniel v. Hendrix, 401 S.E.2d 260, 262 (Ga. 1991) (quotations and citations omitted).

Dr. Lillard's testimony would not assist the trier of fact to determine whether any of Defendant's physicians breached that standard of care. This is true because Dr. Lillard's testimony misstates the standard of care and introduces testimony that would confuse the trier of fact. When asked "[w]hat is the standard of care at the [VAMC]," Dr. Lillard answered "[t]hey don't have one." (Doc. 43-1, at 29.)   He testified "that the standard of care differs depending on where you practice." (Id.)   Dr. Lillard repeatedly emphasizes that, in his opinion, a physician's duties "go[] beyond the standard of care." (Id.)   When asked if Dr. Suykerbuyk violated the standard of care by setting a follow-up appointment two months after prescribing medication, Dr. Lillard answered, "do I think she violated the standard of care as published by the VA, no.  Did I think that she violated the standard of care in regard to this particular complex, yes." (Id. at 28.) Dr. Lillard expressed that his expert report (on which the trier of fact would be called to rely) would have to be interpreted not by the standard of care, but by the "standard of caring, which is a different process." (Id. at 21.)   Dr. Lillard's inconsistent testimony regarding the standard of care would confuse the trier of fact and fails to establish the professional standard of care in this medical malpractice case.

Plaintiffs argue these discrepancies are the result of a misinterpretation of Dr. Lillard's personal opinions and compassion for his patients. (Doc. 44, at 7.) They argue Dr. Lillard does not misstate the law but instead explains the standard of care. (Id.) However, even in one of the passages Plaintiffs reference to support this assertion (where Dr. Lillard states that he "[doesn't] see anything wrong with the VA's documented [standard of care])," he testified that "VA patients deserve [a] level of concern and care . . . that's not in any standard of care document." (Id. at 7-8.) On the whole, Dr. Lillard's references to "different" standards of care, elevated standards of care above the "minimum," and issues "not in standard of care, but standard of caring, which is a different process" would confuse the factfinder. The expert testimony must meaningfully assist the trier of fact to determine exactly what standard of care Defendant's employees were required to employ during the events in question.

Further, Dr. Lillard's testimony does not appear to be based on reliable methods or methodology. In Daubert, the Supreme Court directed district courts faced with the proffer of expert testimony to conduct "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." 509 U.S. at 592-93. There are four

13

factors that courts should consider: (1) whether the theory or technique can be tested, (2) whether it has been subject to peer review, (3) whether the technique has a known or potential rate of error, and (4) whether the theory has attained general acceptance in the relevant community. Id. at 593-94. "These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion." Frazier, 387 F.3d at 1262 (citations omitted). "The trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Kuhmo Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999).

Regardless of the specific factors considered, "[p]roposed testimony must be supported by appropriate validation – i.e., 'good grounds,' based on what is known." Daubert, 509 U.S. at 590. In most cases, "[t]he expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." FED. R. EVID. 702, advisory committee's notes to 2000 amendment. "Presenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough" to carry the proponent's burden. Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla., 402 F.3d 1092, 1113 (11th Cir. 2005). Thus, neither an expert's

qualifications and experience alone nor his unexplained assurance that his or her opinions rely on accepted principles is sufficient. McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1244 (11th Cir. 2005); Frazier, 387 F.3d at 1261. Moreover, when analyzing a witness's reliability, courts must be careful to focus on the expert's principles and methodology rather than the scientific conclusions that they generate. Daubert, 509 U.S. at 595.

Here, Dr. Lillard acknowledges that his testimony was not based on "any specific text" or literature. (Doc. 43-1, at 21.) As noted above, Dr. Lillard clarifies that he "need[s] to interpret how [Defendant] read[s] [his] report" because of his unique approach to the methodology of patient care. (Id.) While Dr. Lillard testifies that he reads and subscribes to several scientific journals, including *Clinical Psychiatry*, *The American Journal of Psychiatry*, and *The New England Journal of Medicine*, his deposition testimony appears almost entirely based on his varied, personal expertise in the field. (Id. at 20.) And while experience can be an acceptable method of supporting expert testimony, "if the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Evanston Ins. Co. v. Xytex Tissue Servs., LLC, 378 F. Supp. 3d 1267, 1279 (S.D. Ga. 2019). Dr. Lillard certainly has

experience as a psychiatrist, even in veteran's care, but his testimony demonstrates an inconsistent approach to the standard of care. For example, his references to treatment recommendations that are "not . . . written in VA standards, but by my standards" are too conclusory for the Court to deem reliable. (Doc. 43-1, at 28.) He asserts that "[a] standard of care . . . ensures that we've done everything possible to ensure the safety of the patient," and repeatedly declines to offer a consistent standard of care, instead stating that the standard of care "depends on the patient." (Id. at 29, 30.) In all, Dr. Lillard's experiences were not sufficiently reliable to assist the trier of fact determine whether any of Defendant's physicians breached the standard of care. Accordingly, Defendant's motion to exclude is **GRANTED**.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A "material" fact is one that could "affect the outcome of the suit under the governing [substantive] law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), while a dispute is genuine "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." Waddell v. Valley Forge Dental

Assocs., Inc., 276 F.3d 1275, 1279 (11th Cir. 2001). Any inferences drawn from the facts must be in the light most favorable to the nonmoving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and the Court is to "resolve all reasonable doubts about the facts in favor of the non-movant." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (citation, internal quotation marks, and internal punctuation omitted). The Court may not weigh the evidence or determine credibility. Anderson, 477 U.S. at 255.

The moving party has the initial burden of showing the Court the basis for its motion by reference to materials in the record. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant may carry its initial burden in different ways depending on who bears the burden of proof at trial. See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the nonmovant bears the burden of proof at trial the movant has two options as to how it can carry its initial burden. Id. at 1115-16. The movant may demonstrate an absence of evidence to support the nonmovant's case, or provide affirmative evidence demonstrating the nonmovant's inability to prove its case at trial. Id. The nonmovant must then respond according to the manner used by the movant. The nonmovant must respond with "evidence sufficient to withstand a directed verdict" when the movant provided affirmative evidence. Id. When the movant demonstrates an absence of

evidence, the nonmovant may either identify evidence in the record sufficient to withstand a directed verdict, or the nonmovant may come forward with additional evidence sufficient to withstand a directed verdict.  Id. at 1116-17.

In this action, the Clerk of Court provided all parties notice of Defendant's motion for summary judgment, the right to file affidavits or other materials in opposition, and the consequences of default.  (Doc. 42.)  For that reason, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985), have been satisfied.  The time for filing materials in opposition has expired, the issues have been thoroughly briefed, and the motion is now ripe for consideration.

## IV. ANALYSIS

Defendant moves for summary judgment on several theories. First, Defendant asserts Plaintiffs failed to exhaust their administrative remedies as to Dr. Conner and the DOD, and as such, the Court lacks subject matter jurisdiction over their claims regarding the same.  (Doc. 41, at 16-17.)  Defendant also argues Plaintiffs Three, Four, and Five never filed any administrative claim against either agency, barring those Plaintiffs' claims in their entirety.  (Doc. 47, at 4-5.)  Second, citing various provisions of Georgia law, Defendant seeks summary judgment on all claims except Plaintiff One's claim for medical malpractice

(wrongful death) and Plaintiff Two's claim for medical malpractice (survival).  This includes what it asserts are derivative claims, including respondeat superior, negligent infliction of emotional distress, and loss of consortium.  (Doc. 41, at 17-19.)  Lastly, Defendant seeks summary judgment on both medical malpractice claims for want of duty, breach, and proximate cause.  (Id. at 19-25.)  The Court will address each of Defendant's claims in turn.

## A. Lack of Subject-Matter Jurisdiction

First, Defendant argues the Court "should grant summary judgment as to any claim against the United States involving the medical care provided by Dr. Conner, an Army physician," because Plaintiffs failed to exhaust their administrative remedies under the Federal Tort Claims Act ("FTCA") regarding the same.  (Id. at 17.)

"The FTCA provides a limited waiver of the United States' sovereign immunity for tort claims."  Dalrymple v. United States, 460 F.3d 1318, 1324 (11th Cir. 2006) (citing Suarez v. United States, 22 F.3d 1064, 1065 (11th Cir. 1994)).  This waiver must be scrupulously observed, and not expanded, by the courts."  Kruger v. United States, 686 F. Supp. 2d 1333, 1335 (N.D. Ga. 2010) (citing Suarez, 22 F.3d at 1065).  "[A] federal court may not exercise jurisdiction over a suit under the FTCA unless the claimant first files an administrative claim with the appropriate agency."  Id. (citation omitted).

19

In this case, "Plaintiffs have admitted that the only administrative claim (SF-95) that was filed was with the [DVA]." (Doc. 41, at 17.)   Accordingly, Defendant seeks summary judgment as to Dr. Conner – an Army physician employed by the DOD – because "[n]o administrative claim was ever filed with the [DOD] as it relates to the claims asserted in this lawsuit."   Id.   Further, Defendant argues Plaintiffs Three, Four, and Five entirely failed to bring any administrative claims under the FTCA and that their claims are accordingly barred.[4]   (Doc. 47, at 4.)   In response, Plaintiffs argue their claim was "constructively filed" with the DOD because the DVA had a regulatory obligation to transfer the claim to the DOD.   (Doc. 45, at 2.)   Plaintiffs failed to respond to Defendant's argument regarding subject matter jurisdiction over Plaintiffs Three, Four, and Five's claims.   (See Doc. 48.)   The Court sets out the regulation – CFR § 14.2 – and its relevant subparts below.

Regarding the transfer of claims between federal agencies, 28 C.F.R. § 14.2(b)(1) provides,

---

[4] Defendant does not raise this argument in its motion for summary judgment, instead raising it for the first time in its reply brief.  (Doc. 47, at 4.)  As a general rule, the Court does not consider arguments raised for the first time in a reply brief.  See, e.g., Del-A-Rae v. Effingham Cnty., No. 415-259, 2016 WL 5329610, at *5 (S.D. Ga. Sept. 21, 2016).  However, a claim of Eleventh Amendment sovereign immunity implicates the Court's subject matter jurisdiction and may be raised at any time.  FED. R. CIV. P. 12(h)(3); Seaborn v. State of Fla., Dep't of Corr., 143 F.3d 1405, 1407 (11th Cir. 1998).  Further, Plaintiffs filed a sur-reply to Defendant's reply, allowing them to respond to Defendant's argument (although they failed to do so).  (Doc. 48.)  Thus, the Court will address Defendant's claim.

> A claim shall be presented to the Federal agency whose activities gave rise to the claim. *When a claim is presented to any other Federal agency, that agency shall transfer it forthwith to the appropriate agency, if the proper agency can be identified from the claim*, and advise the claimant of the transfer. If transfer is not feasible the claim shall be returned to the claimant.

(emphasis added). The regulation also provides guidance for circumstances that may simultaneously involve more than one federal agency. 28 C.F.R. § 14.2(b)(2) provides,

> *When more than one Federal agency is or may be involved in the events giving rise to the claim, an agency with which the claim is filed shall contact all other affected agencies in order to designate the single agency which will thereafter investigate and decide the merits of the claim.* In the event that an agreed[-]upon designation cannot be made by the affected agencies, the Department of Justice shall be consulted and will thereafter designate an agency to investigate and decide the merits of the claim. Once a determination has been made, the designated agency shall notify the claimant that all future correspondence concerning the claim shall be directed to that Federal agency. All involved Federal agencies may agree either to conduct their own administrative reviews and to coordinate the results or to have the investigations conducted by the designated Federal agency, but, in either event, the designated Federal agency will be responsible for the final determination of the claim.

(emphasis added). Finally, 28 C.F.R. § 14.2(b)(3) provides,

> A claimant presenting a claim arising from an incident to more than one agency *should identify each agency to which the claim is submitted at the time each claim is presented.* Where a claim arising from an incident is

> presented to more than one Federal agency
> without any indication that more than one
> agency is involved, and any one of the
> concerned Federal agencies takes final action
> on that claim, the final action thus taken is
> conclusive on the claims presented to the
> other agencies in regard to the time required
> for filing suit set forth in 28 U.S.C.
> 2401(b).

(emphasis added).  Plaintiffs argue that because their claim was "filed against the United States of America and not just the [DVA]," and because their claim mentions an act of Dr. Conner, "the [DOD] was on constructive notice of the claim" as a result of the claim they filed with the DVA.  (Doc. 45, at 2.)

The Court disagrees.  While "the requisite jurisdictional notice under § 2675 [is] 'minimal,' the purpose of that notice is to 'promptly inform the relevant agency of the circumstances of the accident so that it may investigate the claim and respond either by settlement or defense.'"  Tidd v. United States, 786 F.2d 1565, 1568 (11th Cir. 1986) (quoting Adams v. United States, 615 F.2d 284, 289 (5th Cir.), clarified on reh'g, 622 F.2d 197 (1980)).  Here, Plaintiffs' demand letter made only one passing reference to the Department of Defense: "Decedent's spouse, Michele Green, informed VAMC that DDEAMC Dr. Conner had informed her that they could not force decedent to come to the hospital because he was competent."  (Doc. 47-1, at 2.)  Contrary to Plaintiffs' argument, this sentence would not put the DVA on notice of a claim against the DOD; and "if the . . . SF-95 did not provide

22

the [agency] with sufficient notice of [the] claims, the district court lack[s] jurisdiction." _Turner ex rel. Turner v. United States_, 514 F.3d 1194, 1200 (11th Cir. 2008). While "[u]nder this Circuit's generous reading of § 2675(a), a claimant need not state every material fact underlying every legal claim," the "material facts pertinent to the claim [must be] either expressly set out or so closely related to those stated that the agency may reasonably be expected to uncover them in the course of its investigation." _Dixon v. United States_, 96 F. Supp. 3d 1364, 1369-1370 (S.D. Ga. 2015) (citations and quotations omitted).    "The test is an eminently pragmatic one: as long as the language of an administrative claim serves due notice that the agency should investigate the possibility of particular (potentially tortious) conduct, it fulfills the notice-of-claim requirement."   _Id._ at 1370 (quotation and citations omitted).  Plaintiffs here failed to provide their administrative claim to the DOD (or to provide the DVA with sufficient notice of their claim against the DOD).

This failure is further evidenced by the remainder of the administrative claim, which any reasonable reader – even one with legal training – would interpret as clearly directed at the DVA alone.  The claim states it is "based upon _the Agency's_ failure to treat [D]ecedent['s PTSD]."   (Doc. 47-1, at 4 (emphasis added).)  Plaintiffs claim they "solicit[ed] assistance _from the VA_" but "[t]_he VA_ failed to provide adequate medical, clinical and social

care for [the] Veteran." (Id.) In their demand letter, Plaintiffs
One and Two state Decedent's "death was directly related to the
*failure of VAMC* to provide adequate assessment and treatment of
[Decedent's] PTSD diagnosis." (Id. at 1 (emphasis added).) They
allege "*VAMC* physicians, nurses, social workers, and staff
committed acts of negligence[,]" "*VAMC* failed to make reasonable
efforts to ensure that [Decedent's] immediate medical and mental
health needs were addressed," and "*VAMC* made no efforts to
facilitate any treatment of [Decedent's] PTSD, despite the pleas
for help *communicated to VAMC* by his wife and children." (Id. at
2 (emphasis added).) They state that their claims occurred "as a
result of the acts, errors, and omissions committed by the
physicians, agents, and staff *of VAMC*," and they "hereby make a
demand *upon VAMC*." (Id. at 2-3 (emphasis added).) Reading the
administrative claim in its entirety, Plaintiffs simply failed to
put the DVA on notice that they were also asserting claims against
the DOD. One passing reference to a singular act or omission by
a DOD employee was not sufficient to notify the DVA of a claim
against the DOD; in this case, the reference would not have caused
a DVA employee to believe an investigation was warranted into Dr.
Conner's action. Plaintiffs' failure to raise their claims against
the DOD deprives the Court of subject matter jurisdiction over
these claims here, and summary judgment is accordingly **GRANTED** as
to Plaintiffs' claims as they relate to Dr. Conner and DOD.

The Court also agrees that Plaintiffs Three, Four, and Five have failed to exhaust their administrative remedies. "When there are multiple claimants in an FTCA action, each claimant must satisfy the jurisdictional prerequisite of filing a proper claim with an administrative agency prior to instituting a federal suit." Cupp v. United States, No. CV 512-005, 2014 WL 6668282, at *2 (S.D. Ga. Nov. 24, 2014) (citing Turner, 514 F.3d at 1200). "Thus, in multiple claimant actions under the FTCA, each claimant must individually satisfy the jurisdictional prerequisite of filing a proper claim." Kruger v. United States, 686 F. Supp. 2d 1333, 1335 (N.D. Ga. 2010) (citation omitted).

The administrative claim here specifically represents the claimants as "Michele Green Spouse" and "Na'Kesha D. Green, Admin. of the Estate" – Plaintiffs One and Two.  (Doc. 47-1, at 4.) Plaintiffs Three, Four, and Five are not mentioned anywhere on the face of the SF-95 nor in the attached demand letter, in which Attorney Frails states that he represents "Ms. Michelle Green . . . and Ms. Ni'Keshia [sic] Green." (Id. at 1, 4.)  Plaintiffs Three, Four, and Five raise claims under the same theories as Plaintiffs One and Two, but present new claims for wrongful death and survival based on the same.  However, they have not demonstrated that they ever presented those claims to any agency as required by statute, and their failure to do so bars their suit.  Cf. Brown v. United States, 838 F.2d 1157, 1161 (11th Cir. 1988) (holding that where

both actions are based on the same injury in fact, individual administrative claims are not required) and Cupp 2014 WL 6668282, at *3 (finding "the agency had sufficient written notice to allow it to investigate the [claimant's wife's] claim, which was clearly delineated as a loss of consortium claim derivative to [the claimant's] personal injury claim, and the SF-95 placed a value of $1 million (of $4 million total claimed) on [the claimant's wife's claim]"). Defendant's motion for summary judgment as to Plaintiffs Three, Four, and Five, therefore, is also **GRANTED**.

## B. Standing for Wrongful Death, Survival, and Derivative Claims

Even if the Court had subject matter jurisdiction to address Plaintiffs Three, Four, and Five's claims – which, as explained above, it does not - Defendant correctly argues that various Plaintiffs (including those three) lack standing to bring several of their claims. (Doc. 41, at 17.) Defendant correctly asserts that only Plaintiff One - Decedent's surviving spouse - is entitled to bring a cause of action for wrongful death and that only Plaintiff Two - the personal representative of Decedent – is entitled to bring survival claims on behalf of Decedent, including for recovery of funeral, medical, and other expenses resulting from the injury and death. (Id. at 17-18.) Defendant consequently moves for summary judgment as to the wrongful death claim by Plaintiff Two, summary judgment as to the survivorship action by Plaintiff One, and, because it argues the remaining claims are

derivative of those two claims, summary judgment in the entirety as to Plaintiffs Three, Four, and Five.

### 1. Wrongful Death

First, Defendant asserts that only Plaintiff One is entitled to bring a cause of action for wrongful death.  In Georgia, "[t]here is no common law right to file a claim for wrongful death; the claim is entirely a statutory creation." Tolbert v. Maner, 518 S.E.2d 423, 425 (Ga. 1999) (citations omitted).  The statute provides that "wrongful death claims may be brought by only two categories of plaintiffs – the decedent's surviving spouse and, if there is no surviving spouse, the decedent's children." Id. (citing O.C.G.A. § 51-4-2). "Being in derogation of common law, the scope of the Wrongful Death Act must be limited in strict accordance with the statutory language used therein, and such language can never be extended beyond its plain and ordinary meaning." Id. (citation omitted).  If a surviving spouse is alive, the children recover through that spouse's suit; they are not permitted to bring a separate claim. See Matthews v. Douberley, 428 S.E.2d 588, 590 (Ga. Ct. App. 1993).  Accordingly, Plaintiff One is the only proper plaintiff in the wrongful death action, and summary judgment on Plaintiffs Two, Three, Four, and Five's claims for wrongful death is **GRANTED.**

2. Survival Action

Second, Defendant asserts that only Plaintiff Two is entitled to bring a cause of action for survivorship claims. In Georgia, "[w]hen death of a human being results from . . . negligence, the personal representative of the deceased person shall be entitled to recover for the funeral, medical, and other necessary expenses resulting from the injury and death of the deceased person." O.C.G.A. § 51-4-5(b). "No action for a tort shall abate by the death of either party . . . nor shall any action or cause of action for the recovery of damages for homicide, injury to the person, or injury to property abate by the death of either party." O.C.G.A. § 9-2-41. "The cause of action, in case of the death of the plaintiff and in the event there is no right of survivorship in any other person, shall survive to the personal representative of the deceased plaintiff." Id. "[U]nder Georgia law a tort claim is not extinguished by the death of the injured party but survives in his personal representative." McQurter v. City of Atlanta, 572 F. Supp. 1401, 1422 (N.D. Ga. 1983). Importantly, "an individual's claim for wrongful death and an estate's claim for the decedent's pain and suffering are distinct causes of action." Smith v. Mem'l Med. Ctr., Inc., 430 S.E.2d 57, 59 (Ga. Ct. App. 1993).

As noted above, Plaintiff Two - as the administrator of Decedent's estate and as his personal representative - is entitled to bring survival actions on Decedent's behalf, to the exclusion

of any other Plaintiff.   She is also entitled to bring claims for funeral, medical, and other necessary expenses resulting from Decedent's injury and death.   Therefore, summary judgment as to Plaintiffs One, Three, Four, and Five for the survival actions is **GRANTED**.

  2. Derivative Claims

  Third, Defendant asserts that Plaintiffs Three, Four, and Five lack standing to bring any of their remaining claims – respondeat superior, loss of consortium, and negligent infliction of emotional distress – which it argues are derivative of the wrongful death and survival claims. (Doc. 41, at 17-19.)  It also argues punitive damages are unavailable against the United States. (Id. at 18.)

  Regarding the loss of consortium claim, only Plaintiff One brings a claim for loss of consortium.   (See Doc. 28, at 10 ("Plaintiff Michele Green is entitled to recover for loss of consortium damages.").)[5]  Plaintiffs Two, Three, Four, and Five do not bring claims for loss of consortium.

  Regarding the respondeat superior claim, Plaintiffs assert that respondeat superior is a "separate and distinct claim" from their tort claims.   (Doc. 45, at 3.)   However, "[u]nder the

---

[5] The Court also notes that Plaintiff One's loss of consortium claim is merged into her wrongful death claim.  See Walden v. Coleman, 124 S.E.2d 313, 314 (Ga. 1962) ("If death is instantaneous, no cause of action for loss of consortium arises, as all rights are merged in the death action.")

doctrine of respondeat superior, an employer can be held vicariously liable for the negligence of an employee 'when the employee is acting within the course and scope of his employment.'" Yim v. Carr, 827 S.E.2d 685, 691 (Ga. Ct. App. 2019) (citations omitted). The theory of negligence here is medical malpractice; having been barred from bringing claims for medical malpractice as explained above, Plaintiffs Three, Four, and Five cannot bring separate claims for respondeat superior.

As to negligent infliction of emotional distress, Defendant asserts – without citing any authority – that such action is "derivative of [the above-described] claims." (Doc. 41, at 18.) Regarding the survival action, O.C.G.A. § 9-2-41 provides that "[a tort] cause of action, in case of the death of the plaintiff, . . . shall survive *to the personal representative of the deceased plaintiff*" (emphasis added). Plaintiffs assert "Decedent suffered months of ongoing severe emotional distress"; thus, summary judgment is **DENIED** regarding Plaintiff Two's claim for negligent infliction of emotional distress, which is part of her survival claim.

The Amended Complaint also states "*Plaintiffs* suffered severe emotional distress" as a result of Defendant's negligence. (Doc. 28, ¶¶ 36-37.) Plaintiffs' claim is foreclosed as a matter of law. Georgia "Supreme Court precedents . . . expressly prohibit such damages for emotional distress from witnessing [a] serious

injury to a spouse or child and their suffering." McCunney v. Clary, 576 S.E.2d 635, 636 (Ga. Ct. App. 2003). Thus, Plaintiffs One, Three, Four, and Five are barred from raising this claim and summary judgment is **GRANTED** as to those claims.

Finally, Defendant claims that punitive damages are unavailable against the United States. Plaintiffs did not respond to this argument. The FTCA provides, in relevant part, "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages." 28 U.S.C. § 2674; see also Dalrymple, 460 F.3d at 1326 n.9 (holding that "punitive damages and prejudgment interest . . . are not available under the FTCA"). Accordingly, summary judgment on Plaintiffs' claims for punitive damages is **GRANTED**.

In sum, summary judgment on all of Plaintiffs Three, Four, and Five's claims is **GRANTED**. Summary judgment is **GRANTED** on Plaintiff One's claims for survival, Plaintiff Two's claim for wrongful death, and all claims for punitive damages. The only remaining claims are those brought by Plaintiffs One and Two related to the medical malpractice action - namely (1) Plaintiff One's claim for medical malpractice (wrongful death) and respondeat superior and (2) Plaintiff Two's claims for medical malpractice (survival), negligent infliction of emotional distress

as it relates to Decedent's emotional distress, and respondeat superior.   The Court will now turn to Defendant's motion for summary judgment on those remaining claims.

## B. Professional Negligence (Medical Malpractice)

"To prove [medical malpractice] in Georgia, a plaintiff must show: (1) the duty inherent in the health care provider-patient relationship; (2) breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure is the proximate cause of the injury sustained." Knight, 585 S.E.2d at 105 (citing Zwiren v. Thompson, 578 S.E.2d 862, 864 (Ga. 2003)). Defendant argues it did not breach the standard of care for two reasons: (1) it did not have the authority to involuntarily treat Decedent and (2) it "could not monitor his prescription intake or ensure that he received adequate follow-up examinations." (Doc. 41, at 19-21.)   Defendant further argues Dr. Suykerbuyk and Decedent lacked a provider-patient relationship and that any alleged malpractice was not the proximate cause of the Decedent's death. (Doc. 41, at 21-25.)   The Court addresses the arguments in that order.

### 1. Authority to Involuntarily Commit

First, the Court will address Defendant's argument that it did not have the authority to involuntarily treat Decedent.   The Court construes this argument to go to the second element of medical malpractice: that Defendant allegedly failed to exercise

the requisite degree of skill and care.   (<u>Id.</u> at 19-21.)
Plaintiffs argue that Defendant failed to exercise due care by
declining to employ involuntary treatment ("including involuntary
admission to a mental health care facility").   (Doc. 28, ¶ 30.)
They assert that "[b]y failing to [involuntarily] admit Decedent
to a mental health facility and by failing to adequately monitor
his prescription intake even after being advised on an ongoing
basis of his bizarre behavior and noncompliance with his
established treatment plan," Defendant "deviated from the standard
of care, and that deviation was the direct and proximate cause" of
Decedent's death.   (<u>Id.</u> ¶ 31.)   Defendant responds that because
Decedent's "physicians could not forcibly examine or admit
[Decedent], they could not monitor his prescription intake or
ensure that he received adequate follow-up examinations, and as
such, summary judgment should be granted in full to Defendant as
to the professional negligence and wrongful death claims, as well
as all other claims set forth in the Amended Complaint."   (Doc.
41, at 20-21.)   Defendant essentially argues it could not have
breached its duty by failing to involuntarily commit Decedent
because it had no legal authority to do so in the first instance.

In Georgia, "the General Assembly has imposed on every
physician the duty to 'bring to the exercise of his profession a
reasonable degree of skill and care.'"   <u>Peterson v. Reeves</u>, 727
S.E.2d 171, 174 (Ga. Ct. App. 2012) (citing O.C.G.A. § 51-1-27).

Involuntary admission to emergency receiving facilities is governed by O.C.G.A. § 37-3-41, which states, "Any physician[6] . . . may execute a certificate stating that he or she has personally examined a person within the preceding 48 hours and found that, based upon observations set forth in the certificate, such person appears to be a mentally ill person requiring involuntary treatment." An executed certificate requires a peace officer to "deliver [the patient] forthwith to the nearest available emergency receiving facility." Id. Defendant argues it lacked the ability to involuntarily commit Decedent because none of its employees "personally examined" Decedent during any of the alleged instances of malpractice. (Doc. 41, at 20.)

Plaintiffs allege that on November 14, 2016, Plaintiff One "reported to [VAMC] social workers that [Decedent] was experiencing auditory and visual hallucinations, exhibiting delusional behavior and extreme paranoia, had confined himself to his bedroom, . . . had stopped attending classes, and had cancelled a major medical appointment" for the first time. (Doc. 28, ¶ 19.) "[W]hile Plaintiff [One] was consulting with [VA] social worker staff, [Ms. Battle] made contact with [Decedent] via telephone to explain the situation." (Id. ¶ 21.) However, Decedent's treating

---

[6] As Defendant notes, the statute also contemplates psychologists, clinical social workers, licensed professional counselors, marriage and family therapists, and clinical nurse specialists in psychiatric/mental health to utilize this code section. See O.C.G.A. § 37-3-41(d).

physicians and social workers "indicated that they could not involuntarily admit [Decedent] to an emergency room or mental health facility for evaluation because he had not been declared incompetent" and that the VAMC "was a voluntarily hospital[,] and that the medical staff at [the VAMC] could not force [Decedent] to accept treatment." (Id. ¶¶ 22-23.) The next day, Dr. Gordineer, Dr. Suykerbuyk, Mr. Windley, and Ms. Battle "reviewed and signed off on the note from November 14, 2016 in which Plaintiff [One] expressed her concerns regarding [Decedent]." (Id. ¶ 24.) Plaintiff alleges these individuals "knew or should have known of [Decedent's] mental status and need for medical assistance" and therefore breached their duty to care for Decedent by failing to involuntarily commit him. (Doc. 45, at 5.)

To start, a physician's duty of care *may*, in some circumstances, encompass a duty to involuntarily commit a patient. As the Court of Appeals of Georgia explained in Peterson, a case regarding the standard of care in involuntary commitment cases, "[t]he duty at issue is not, properly speaking, a duty to involuntarily commit. It is a much broader duty, which may, in particular cases, entail a duty to commit." 727 S.E.2d at 175. In cases where a plaintiff alleges that a doctor negligently failed to involuntarily commit her to a mental health facility, that plaintiff actually "alleges breach of the duty to care for her in compliance with the standard of care applicable to psychiatrists

and counselors." Id. Accordingly, Defendant "can be held liable if his treatment of [Decedent] fell below the requisite standard of care, and this failure proximately caused [Decedent's] injury." Id. (citation omitted). The question here, then, is whether, in light of "Decedent's severe mental decompensation, including hallucinations, paranoia, delusional behavior, and questionable compliance with medications," Defendant's failure to involuntarily commit Decedent and monitor his prescription intake thereafter breached Defendant's duty of care. (Doc. 28, at 7.) Indeed, "it is well-settled that in order to establish medical malpractice, the evidence presented by the [Plaintiff] must show a violation of the degree of care and skill required of a physician." Sw. Emergency Physicians, P.C. v. Quinney, 819 S.E.2d 696, 706 (Ga. Ct. App. 2018) (citation and quotation omitted). "Such standard of care has been defined as that which, under similar conditions and like circumstances, is ordinarily employed by the medical profession generally." Id. (citation and quotation omitted).

Plaintiffs argue that "any [of] the medical professionals who signed and acknowledged the note on November 14" (referring to the progress note entered by Ms. Battle in Decedent's medical record) "could have relied upon [Plaintiff One and Plaintiff Two's] observations and executed the form." (Doc. 45, at 6.) They argue the failure to do so by Dr. Gordineer, Dr. Suykerbuyk, Mr. Windley, and Ms. Battle was a breach of the duty of care; to that effect,

Dr. Shafey testified that on November 15, after reading the progress note, Dr. Gordineer and Dr. Suykerbuyk violated the standard of care by failing to have Decedent hospitalized. (Doc. 48-1, at 20.)

However, O.C.G.A. § 37-3-41 only allows for involuntarily hospitalization when a "physician . . . has *personally examined* a person within the preceding 48 hours." Here, Plaintiffs do not allege Dr. Gordineer or Dr. Suykerbuyk personally examined Decedent - only that they "knew or should have known of [Decedent's] mental status and need for medical assistance" from the progress notes and encounter between Plaintiffs One and Two and Ms. Battle. (Doc. 45, at 5.) And while the evidence shows that Ms. Battle and Decedent had a telephone conversation on November 14, 2016, Plaintiffs have provided no evidence that Ms. Battle conducted a 'personal examination' of Decedent over the phone. Even if they had, a phone conversation between Decedent and Ms. Battle (1) would still not constitute a "personal examination" as required by the statute, and (2) would not equate to "personal examination" by Dr. Suykerbuyk and/or Dr. Gordineer.[7]

---

[7] While the Parties do not point to any case in which a court interprets the phrase "personally examined" in this context, and the Court has been unable to find any, at least one court has suggested that a phone conversation may be insufficient to comply with the statute here - at least with a non-responsive patient. See Harbaugh v. Stochel, No. 3:12-CV-110, 2013 WL 1809638, at *6 (M.D. Ga. April 29, 2013) (noting that a physician "failed to examine a patient" where the physician, via telephone, spoke with her concerned husband about the patient's condition and informed the patient that she would be hospitalized, in response to which the patient hung up.) That court also noted that the physician "did not conduct a mental status exam during the phone call." (Id. at 2.)

As Defendant correctly notes, Georgia courts "have required [albeit in the context of false imprisonment cases] . . . strict compliance with the procedures mandated by [O.C.G.A. § 37-3-41]." Williams v. Smith, 348 S.E.2d 50, 53 (Ga. Ct. App. 1986) (quotation and citation omitted). "The procedural safeguards contained in [that provision] are obviously there for the purpose of ensuring that individual rights are not eroded in the name of medical expediency." Id. (quotation and citation omitted).

Lastly, Plaintiffs have not presented evidence of any standard of care for social workers. As noted above, Dr. Lillard's testimony has been excluded. "Among other things, a plaintiff in a medical malpractice action must demonstrate a violation of the applicable medical standard of care." Lockhart v. Bloom, 859 S.E.2d 918, 920 (Ga. Ct. App. 2021) (citation omitted). Even Dr. Shafey, one of Plaintiffs' experts, admits that "the social worker Ms. Battle did the right thing." (Doc. 48-1, at 20.) Accordingly, summary judgment as to any actions by Ms. Battle and Mr. Windley is appropriate.

Because none of Defendant's employees were legally permitted to involuntarily hospitalize Decedent, their failure to do so was not - as a matter of law - a breach of the standard of care. Accordingly, Defendant's motion for summary judgment is **GRANTED** on

---

Here, Plaintiffs allege Ms. Battle "spoke with" Decedent, who stated "I am fine, I do not need to see a doctor." (Doc. 45, at 5; Doc. 41-2, at 4.)

Plaintiffs' claims for medical malpractice as they relate to Defendant's failure to involuntarily hospitalize Decedent.

3. <u>Negligent Failure to Monitor Prescription Intake</u>

In addition to their claim that Defendant negligently failed to involuntarily hospitalize Decedent, Plaintiffs allege Dr. Suykerbuyk was negligent by her failure to adequately monitor Decedent's prescription intake. Specifically, Plaintiffs aver "Dr. Suykerbuyk discharged [Decedent] into Dr. Gordineer's care (as a primary physician) to continue with the prescriptions of Doxepin and Paroxetine." (Doc. 28, ¶ 14.) Dr. Shafey testified that Decedent "should have had follow-up to make sure that the dose of Doxepin was working, that the Paroxetine was working with it and to continue to ensure that he was stable." (Doc. 48-1, at 11.) Dr. Shafey agreed it was "fair to say that [his] criticism of Dr. Suykerbuyk at this visit in April 2016[] is that she did not bring him back for follow-up and referred him back to his primary care physician[.]" (Id.)

As an initial matter, Defendant does not contest the first two elements of medical malpractice regarding this claim; rather, Defendant cabins its arguments on those elements to Plaintiffs' claim for negligent failure to involuntarily hospitalize Decedent. (Doc. 41, at 19-22.) Specifically, it alleges "[n]o physician, nurse, social worker, or other government employee had the authority to employ involuntary treatment of [Decedent]," and that

*as a result*, "they could not monitor [Decedent's] prescription intake or ensure that he received adequate follow-up examinations." (Id. at 19-20.) Defendant does *not* argue that Dr. Suykerbuyk could not have declined to discharge Decedent back to Dr. Gordineer in April 2016; nor does it argue she could not have monitored his prescription intake instead of discharging him at that time. Further, regarding its motion for summary judgment on the doctor-patient relationship, Defendant alleges "no doctor-patient relationship existed between [Decedent] and Dr. Suykerbuyk *on November 14, 2016*." (Id. at 21 (emphasis added).) It does not argue Dr. Suykerbuyk and Decedent lacked a doctor-patient relationship in April 2016, nor could it; the record evidence is clear that Decedent and Dr. Suykerbuyk enjoyed a doctor-patient relationship at that time. (See Doc. 41-2, at 17-19.) Defendant does, however, argue for summary judgment on the third element of medical malpractice: that "the alleged professional negligence was not the proximate cause of [Decedent's] death." (Doc. 41, at 23.) As a result, the Court must determine whether a genuine dispute of material fact exists regarding whether Dr. Suykerbuyk's allegedly negligently discharge of Decedent back to his primary care physician was the proximate cause of his death.

"It is clear that a plaintiff cannot recover for medical malpractice, even where there is evidence of negligence, unless the plaintiff establishes by a preponderance of the evidence that

the negligence either proximately caused or contributed to cause plaintiff harm." Zwiren v. Thompson, 578 S.E.2d 862, 864 (Ga. 2003) (citations and punctuation omitted).

> Proximate cause is that which, in the natural and continuous sequence, unbroken by other causes, produces an event, and without which the event would not have occurred. What amounts to proximate cause is undeniably a jury question and is always to be determined on the facts of each case upon mixed considerations of logic, common sense, justice, policy, and precedent.

Peterson, 727 S.E.2d at 176 (citing Zwiren, 578 S.E.2d 862). However, "[e]ven though proximate cause is undeniably a jury question, . . . in plain and palpable cases, the lack of proximate cause can be determined by the trial court as a matter of law." Miranda v. Fulton DeKalb Hosp. Auth., 644 S.E.2d 164, 167 (Ga. Ct. App. 2007) (quotations and citations omitted). "In order to establish proximate cause . . . the plaintiff must use expert testimony because the question of whether the alleged professional negligence caused the plaintiff's injury is generally one for specialized expert knowledge beyond the ken of the average layperson." Zwiren, 578 S.E.2d at 865 (citations omitted). "In presenting an opinion on causation, the expert is required to 'express some basis for both the confidence with which his conclusion is formed, and the probability that his conclusion is accurate.'" Id. (citation omitted). "Perhaps in the world of medicine[,] nothing is absolutely certain. Nonetheless, . . . it

is the intent of our law that if the plaintiff medical expert cannot form an opinion with sufficient certainty so as to make a medical judgment, there is nothing on the record with which a jury can make a decision with sufficient certainty so as to make a legal judgment." Id. (citations omitted). In line with this standard, to establish proximate cause, "the expert testimony must provide a causal connection that is 'more than mere chance or speculation.'" Id. (citation omitted). "[I]t must provide more than a mere or bare possibility that the alleged negligence caused the plaintiff's injury." Id. (citations omitted).

Here, Dr. Shafey testified that "all of" Defendant's allegedly negligent activities – beginning in April 2016 with her failure to "refer him to [an] appropriate mental health professional to take on her recommendation to increase the Doxepin" and culminating with the above-described failure to involuntary commit Decedent – "led to [Decedent's] unfortunate subsequent suicide." (Doc. 48-1, at 9.) Dr. Shafey specifically testified that follow-up appointments with a psychiatrist were necessary here because a patient like Decedent, with the "severity of [his] pathology, the depression, the anxiety, the PTSD" . . . "after . . . a week or two or six weeks [of taking the medication] . . . can decompensate." (Id. at 10-11.) In his affidavit, Dr. Shafey similarly opined "to a reasonable degree of medical certainty that . . . by failing to adequately monitor [Decedent's] prescription

intake . . . [Decedent's] treating and examining physicians at the [VAMC] deviated from the standard of care, and that deviation was the direct and proximate cause of [Decedent's] untimely demise." (Doc. 28-2, at 6.)   In light of these averments, the Court cannot say it is "plain and palpable" that Dr. Suykerbuyk's failure to schedule psychiatric follow-up visits for Decedent was not the proximate cause of his allegedly wrongful death.

Defendant asserts two intervening omissions broke the causal chain: (1) Plaintiffs' failure to petition the probate court for involuntary treatment, and (2) allowing Decedent to locate the gun that Plaintiffs had previously taken out of his possession.   (Doc. 41, at 23-24.)

> It is well settled that there can be no proximate cause where there has intervened between the act of the defendant and the injury to the plaintiff, an independent, intervening, act or omission of someone other than the defendant, which was not foreseeable by defendant, was not triggered by defendant's act, and which was sufficient of itself to cause the injury.

Pruette v. Phoebe Putney Mem'l Hosp., 671 S.E.2d 844, 850 (Ga. Ct. App. 2008) (quoting Powell v. Harsco Corp., 433 S.E.2d 608 (Ga. Ct. App. 1993)).   Essentially, Defendant alleges Plaintiffs could have prevented Decedent's death.   While Plaintiffs may have prevented Decedent's death by taking the actions Defendant alleges, it cannot be said that their actions *caused* Decedent's death to break the chain of causation allegedly beginning with Dr.

Suykerbuyk's original breach: her allegedly negligent failure to ensure that Decedent follow up with a psychiatrist.

> While the general rule is that if, subsequently to an original wrongful or negligent act, a new cause has intervened, of itself sufficient to stand as the cause of the misfortune, the former must be considered as too remote, *still if the character of the intervening act claimed to break the connection between the original wrongful act and the subsequent injury was such that its probable or natural consequences could reasonably have been anticipated, apprehended, or foreseen by the original wrong-doer, the causal connection is not broken, and the original wrong-doer is responsible for all of the consequences resulting from the intervening act.*'

<u>Church's Fried Chicken, Inc. v. Lewis</u>, 256 S.E.2d 916, 920 (Ga. Ct. App. 1979) (citing <u>Blakely v. Johnson</u>, 140 S.E.2d 857, 859 (Ga. 1965) (emphasis added). Here, while the intervening acts may have been subsequent, additional proximate causes of Decedent's death, Dr. Shafey's testimony has created a jury question regarding whether Dr. Suykerbuyk's allegedly negligent failure to follow up with Decedent was also a proximate cause of Decedent's suicide. Accordingly, Plaintiffs' alleged failures do not break the causal chain at this stage and summary judgment as to this claim is **DENIED.**

## V. CONCLUSION

Based on the foregoing, **IT IS HEREBY ORDERED** that Defendant's motion for summary judgment (Doc. 41) is **GRANTED IN PART and DENIED IN PART**. Summary judgment is **GRANTED** on all of Plaintiffs Three, Four, and Five's claims; Plaintiff One's claims for survival; Plaintiff Two's claim for wrongful death; and all claims for punitive damages. Summary Judgment is also **GRANTED** on Plaintiffs' claims for medical malpractice as they relate to Defendant's failure to involuntarily hospitalize Decedent. Summary judgment is **DENIED** as to Plaintiffs' claims that Dr. Suykerbuyk negligently failed to monitor Decedent's prescription intake. Defendant's motion to exclude (Doc. 43) is **GRANTED.**

**ORDER ENTERED** at Augusta, Georgia, this 30th day of March, 2022.

_____
J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA